1336 B.A. Robert Hawkins v. Commonwealth Edison Co. And again, once you're all settled in, we'll ask the attorneys who are going to argue to step up simultaneously to tell us who you are and whom you represent. Good morning, Your Honors. Stuart Chanin on behalf of the Hawkins Plaintiffs. Good morning, Your Honors. David Stahl on behalf of Commonwealth Edison Company. All right, thank you, Counsel. Mr. Chanin, you can proceed. Thank you very much, Your Honor. Your Honors, may it please the Court, my name is Stuart Chanin, and along with my co-counsel, Paul Neelan, we represent a proposed class of ComEd customers. The core fact of this case is that ComEd intentionally and willfully violated an order of the Illinois Commerce Commission, the agency appointed to regulate it, and whose orders ComEd is statutorily required to obey. So important is that fact that the Illinois legislature in Section 5-101 simply wrote a provision directing that all public utilities must follow the orders of the commission. It's actually a lot worse than that, because ComEd not only failed, not only defied an order of the ICC, but immediately before defying that order, ComEd sought a stay of that very order from the ICC. And the ICC said no. The ICC rejected ComEd's request for a stay. Mr. Chanin, ComEd had been ordered to do certain things in accordance with a particular timeline, right? Yes. And according to their expert, when they sought the stay, they determined that the timeline was unrealistic and that they couldn't meet the timeline for various and sundry reasons. Seeking a stay, was there any other vehicle for them to have used to bring before the commission the fact that, no, we can't meet this timeline because it's going to, whatever they said, it's going to cost them more money or whatever it is. But wasn't that the appropriate vehicle for them to use to seek a stay? Or if not, what was it? Absolutely, Your Honor. We absolutely agree that seeking a stay was an appropriate vehicle. But once they chose that vehicle, and the ICC said, we disagree with you. We think these two issues are distinct. You're fighting over here in the formula rate docket over your rates. But what you have in front of us in this docket is the smart meter deployment schedule, as Your Honor just said, a scheduling issue. It would be as if you made an order in this court, and I said, you know what, Your Honor, I don't want to follow this court's order because there's an Illinois appellate court in Quincy that's dealing with a related issue, and I don't want to, I'm not going to follow this court's order really until that issue gets resolved. They went to the ICC. It was the ICC's decision to decide whether, because they were going to lose money or not, they had a right to defy the deployment order. It was the ICC's decision to decide whether or not the scheduling order it issued and directed ComEd to follow had to be followed. And what happened instead was ComEd took the law into its own hands. It decided that it would be the judge of what was just and reasonable under the Public Utilities Act. Now, Mr. Channing, your clients in this case are suing as rate payers, is that right? Basically as customers of ComEd? Absolutely, Judge. And there's nothing particular with respect to their homes or businesses that's different than mine? In the world of smart meters? I actually have to answer that very carefully, Judge, because it happens that one of the two lead plaintiffs, the one actually named in the complaint, lives in the area where the very beginning of the smart meter was to be rolled out. But there's thousands of people who live in that area, right? Absolutely. That's sort of where I'm headed here. Okay. Okay. I'm trying to read the tea leaves here because one of the rules we have to follow is we have to follow what the Supreme Court tells us. And we have Scheffler and we have the more recent case. Pusaterior. Thank you. And what the Supreme Court seems to be telling us is that if something affects the rates, it's within the province of the commission. But if something different happens, for instance, you get hit by a ComEd truck, all right? A ComEd line falls on your roof. Then you can sue in court for that. And so everything focuses on, you know, what are the damages? What's the relief you're seeking in the underlying chancery case? And isn't it something relating that you would have lower rates, you'd have lower bills, if, in fact, the smart meter technology was rolled out on time? Your Honor. And if that's the case, then how do we get around the Supreme Court cases? If Pusaterior and Scheffler were the only cases, if that were the entire history of exclusive jurisdiction in this state, I would agree with Your Honor and understand exactly where you're coming from. They're not the only cases. There are several key earlier cases. The first appellate court in Thomas, in Flournoy, in Sutherland. These are cases that were also about rates in the sense that they involved the utility that was being provided. But those cases that you just named are all earlier than the cases that Justice DeLorte's talking about. Are they all appellate too? You are both absolutely right. They are, A, all earlier, and they are, B, all appellate court cases, not Supreme Court cases. As much as we'd like to, we can't tell our Supreme Court what to do. They usually tell us. And if those are later cases, how do we get around following what the Supreme Court has declared to be the law of the land in this state with respect to rate issues? Very simple in this case, Judge Cunningham. Neither Scheffler nor Pusaterior changed the longstanding law in this state, which is that you are, and I'm reading directly from Pusaterior quoting Scheffler. And I too, Judge, need my reading glasses. I felt it. I'm glad you reached for yours in the other case. It made me feel more comfortable. In Scheffler, we noted a claim is for reparations or refunds when the essence of the claim is that a utility has charged too much for a service. Charged too much for a service. While a claim is for civil damages when the essence of the complaint is that the utility has done something else to wrong the plaintiff. And if you go back and look at those cases, each of these two cases are at their core rape cases. In Scheffler, there was a storm. Five days went by. The plaintiffs were upset that their electricity was still shut off, and they ran into circuit court. But there was a tariff that covered that. There was the doctrine of exclusive jurisdiction that covered that. And in Scheffler, the Supreme Court said that kind of case has to be in the commission. In Pusaterior, the plaintiff tried to do an end run around the commission. In both of those cases, it's very important that the issue had never been raised in the commission, that they went straight to the court. We'll get back to that in a second. But in Pusaterior, they said, forget the Public Utilities Act. We're going to go straight to the False Claims Act and do an end run. I think Pusaterior, the Illinois Supreme Court, called it a collateral attack. But if you get back to that core principle that I just read to you, the something else in this case was the violation of the deployment scheduling order. We are not attacking rapes. We are not trying to take away from the commission. And your clients are upset about that delay because it affects their bills. But, Judge, if you look at it that way. Well, it's the failure to deploy these meters. Okay. Tell me, why is the failure to deploy these meters outside of the service and infrastructure of Comet? Your Honor, in every one of these cases. As simply as you can. Why is it outside? Because the commission will still be able to use formula rate, which is the new system, to charge for smart meters in the exact same way it would have done it from the get-go. All that happened in this case is Comet, on their own initiative and in violation of the commission order, moved the schedule from here to here. Whatever rates the commission applies to electricity service using the smart meters, using the formula rate, our clients are not complaining about that. We are not asking the commission to handle rates differently. We are not saying smart meters are bad or left us with inadequate service. We're not saying we're paying too much for smart meters. We are saying that in this narrow window, where Comet had violated an order of the commission, by doing so, it damaged the plaintiff's savings. And, you know, if these were savings, some fantasy in my mind that the consumers would have saved money had this delay not occurred, that would be one thing. But we are relying for our argument that damages were caused in this window on Comet's own expert witnesses who said if we start smart meters here, this will be the benefit for your consumers. But if we start smart meters here, this will be the benefit to consumers. And it's the failure to follow that order, Your Honor, that makes this case much more like, yes, they're older. Yes, they're from the Illinois Appellate Court. But it makes this case much more like Flournoy, Sutherland, Thompson. Well, let's take that. When we talk about failure to comply with a governmental order, it's almost in the court sense it's a contempt proceeding. But if it's an agency, isn't it the agency's call to decide what penalty to impose for the violation of that order? Thank you for asking that, Judge, because that's exactly the Gowdy case. That's exactly the Gowdy case. In Gowdy, and it's an old case. I mean, I can't help that it's a 1976 case. But in Gowdy, here's what happened. The Illinois Supreme Court told ComEd, you must tell consumers that their decision to purchase light bulbs from you is optional. You can't put it on their bill. You can't put it on their bill and not make clear to them it's optional. And then we're going to remand the case to the commission. And the commission is going to come up with some protocol regarding the light bulbs. Then the commission issues an order. ComEd still doesn't follow the order. So a class, and by the way, just like here, it was the full class of consumers, they sue, and they say that something else here is ComEd's continuing refusal to follow the Illinois Supreme Court in the consumer's coffee case and the commission's order that followed the consumer's coffee case. And ComEd went to the Supreme Court just like in this case, and they said, wait a second. We're talking about infrastructure, the light bulbs. We're talking about service. We're talking about rates. We're talking about what's fair to charge for the light bulbs and so on and so forth. That's got to be in the commission. And this Illinois appellate court said, no, that's not right. The something else that was done here to harm the plaintiffs was your failure to follow the Supreme Court and commission's direction about communicating the optional nature. Now, the price, no one was fighting in that case about the price of the light bulbs. It was the communication. Well, the price was a discrete amount that was separated out from the charge for energy, wasn't it? I believe that's correct, yeah. Okay. All right. So it's a little bit different than here because that's where I'm leading to my next question. If you look at Pusateri, it's paragraph 20, and I'll just paraphrase it. You don't have to hunt it down. But putting aside the False Claims Act, which is probably a red herring, okay, but the Supreme Court says, well, there's another reason why we're doing what we're doing. And they say in paragraph 20, it's not possible to determine how much the fraud increased the rate without determining what the rate would be, and the use of expert witnesses would not resolve the defect. The circuit court would be simply asking experts to exercise the judgment statutorily reserved to the commission, and then the court would be setting rates, which is something the commission should be doing. How is this different than that? How do we get around paragraph 20 in Pusateri? In two primary ways, Your Honor. One, we believe that what we're asking the circuit court to do in this case is something that circuit court judges do every day. There is nothing about the technology or the specialized knowledge that the ICC commissioners and ALJs that they have that will be used to assess the harm that they caused in this case. All right? But what is the harm if it's not a higher rate on the bill for energy services? Well, a formula rate, but now we have another problem. In the last 50 years that we've been fighting over this exclusive jurisdiction issue, there's been what's called traditional rate making, where it is reserved to the ICC to use its subjective judgment and its expertise about the utilities field, in this case electricity, to establish a fair rate. ComEd didn't like operating under that system, and ComEd lobbied the Illinois legislature hard for a change in that system to a system called formula rate. And the reason I can say that, Judge, is we pled in the complaint that ComEd played a major role in the passage of the EIMA. When the system switched to formula rate, it now leaves the ICC in a position of applying much more objective, less subjective standards in calculating the rates that it's going to allow ComEd to charge its customers and the amount of money that ComEd will receive for the electricity that it supplies. This decision of how much harm was caused to our clients, the class, in that narrow time period, does not involve use of the formula rates. And you'll recall early in my argument, I said to your honors, one of the arguments that ComEd made to the ICC is that formula rates and deployment schedule are inextricably linked. In essence, your honor, the very question you're asking me now. And they said they're inextricably linked. And until our formula rate issues that we object to, the commission ruled on their formula rate, but they didn't like it. So they said, first we want a re-hearing, then we want to go to the legislature to change it. But until we get all that resolved, we cannot go forward with the smart meter deployment schedule because they're linked. And you know what the ICC said? The ICC said no, they're not linked. Now they didn't literally use those words, but they denied the motion to stay. They said, look, go fight over the formula rate. God bless you. We hope you get the larger formula rate. Whatever happens. But in the meantime, there's customers out there who need these smart meters. You know, the Illinois legislature, when they passed EIMA, they told ComEd, you get a schedule proposed within six months. You have a deadline of six months. And then they told the ICC in the statute, you have a deadline of two months. Whatever hearings you're going to conduct on smart meters, you better get the whole thing wrapped up in two months. Because they cared about getting the smart meters into the hands of the customers. And so what the ICC said, and that's the other answer to your question. I told you there were two.  It's not like Pusateri or Scheffler, where in both cases the plaintiffs were trying to do a completed run around the ICC. You know, if they had filed their ICTC scheduling petition, and then two days later we had run to circuit court, that would be one thing. But that's not what happened. They filed their petition. There were hearings. There were experts. There were community groups. There was an ALJ. There was testimony. There were stacks and stacks of pages of evidence on utilities that I had to read and barely followed. But the fact is, this was before the ICC. They considered the scheduling issues. They ruled on the scheduling issues. They ruled on ComEd's motion for a stay. They agreed to have a rehearing order. This has been before the ICC. Their expertise has been brought to bear. And you know what all of that led to? ComEd violating, defying their order. Well, if something like that happens, that's a place where 5201, where the something else to harm the plaintiffs over and above a fight about race, those cases belong in the circuit court. Mr. Shannon, you've overstepped your time, so let me ask you to conclude. I apologize. And you've got a few minutes for rebuttal. I'll save the concluding remarks for later. All right. Thank you. Thank you. Mr. Stahl. Yes. Thank you, Your Honors. May it please the Court, David Stahl on behalf of Commonwealth Medicine Company. I think that we had a lot of discussion about the orders and the stays and what ComEd did back in 2012. Frankly, I don't think any of that is necessarily relevant to this appeal. We have accepted the well-pleaded fact in the complaint that ComEd was in violation of the order. We don't agree with that. And to your question, Justice Cunningham, that order did not require ComEd to do anything. This was an order approving a schedule that had been submitted by ComEd. And you don't need to decide the merit or lack of merit of that argument for purposes of this appeal, but it is something that ComEd is reserving on if this case were to go any further. But the reality of this case is Pusatiri makes it crystal clear that the decision of the Circuit Court rejecting this case on grounds of exclusive jurisdiction on the Scheffler case was eminently correct. And let me give you five reasons I think why Pusatiri combined with Scheffler requires that decision be affirmed. First of all, one of the things that appellants always objected to about Scheffler was that the language about exclusive jurisdiction in that case was merely dictum. The case was really decided on the basis of the tariff. Whether or not that's true, and we disagree with that characterization of Scheffler, at this point in time Pusatiri makes it absolutely clear that the Supreme Court meant what it said in Scheffler, and Pusatiri relies, as your honors know, very heavily on the Scheffler decision. Secondly, Pusatiri requires affirmance because it sets forth a four-stage analysis of when a case is properly before the ICC and when it may be brought to court. That is set forth in paragraphs 18 and 19 of Pusatiri. First thing it does, it says exclusive jurisdiction depends on whether the claim is one for reparations as opposed to civil damages. Number two, a claim is for reparations when it claims that the rates that customers are paying are too high, or as in this case, will be too high in the future. But it's for civil damages when the utility has done something else. And they cite, interestingly enough, Flournoy to support that something else. I don't want to get into all the facts of Flournoy and Thomas and Sutherland at this point. I'm happy to answer questions about those, but let me move to the third point of Pusatiri. And this is exactly our case here. The Supreme Court said in Pusatiri, at its heart, Pusatiri's complaint alleges people's gas used fraudulent means to get the state and others to pay too much for natural gas. You can submit, or substitute rather, a few words to that paragraph for this case and you'll have the same conclusion. At its heart, Hawkins' complaint alleges that ComEd violated a commission order with the result being customers will pay too much for delivery services, electric delivery services. And the fourth point in Pusatiri, following from the first three, is that because of all of these things, that what was at the heart of Pusatiri's complaint was that customers will pay too much for utility services. Therefore, Pusatiri's complaint is one for reparations, subject to the exclusive jurisdiction of the Illinois Commerce Commission. So, Mr. Stahl, you're saying that they really brought the case in the wrong place. If they're complaining that ComEd was a noncompliance, they should have gone to the commission with that. Well, and they still could go to the commission in some ways. They could have, back in June of 2012, if in fact Plaintiff Robin Hawkins was one of those people who were supposed to get one of the 131,000 meters in 2012, Robin Hawkins could have gone to the commission and could have complained to the commission, if it was so important to Robin Hawkins, that ComEd is violating your order. Could have done that. But she couldn't have done any kind of a class action. No, but here's the thing. The nature of regulation at the commission is, the commission is not going to simply order ComEd to install a meter for Robin Hawkins. If, in fact, there was merit to what Robin Hawkins was saying, and the commission agreed with that, then all of those 131,000 customers would have benefited from whatever Robin Hawkins did at the commission. And I'm not saying that it ought to be held against Robin Hawkins in any way, but that is something that Hawkins could have done. But that goes to their argument that ComEd is such a big utility, and the commission issued an order and ComEd chose to ignore it, and so under 5201 their only recourse is going to the circuit court to ask the circuit court to force ComEd to comply. That's basically what their argument is. Well, no, they're not asking the circuit court to require ComEd to comply. They're asking the circuit court to award damages, which will be in the form of the difference between what rates would have been under that compliance schedule versus what rates might be 15 or 20 years into the future. But I think, Mr. Stahl, my point is, and you can answer this any way you want, their argument is they have to have, there is a wrong, and they've got to have a forum to seek redress for this wrong, and you're saying, no, they don't have a forum. No, not at all. I'm not saying that. Or they could go to the commission if they want to. Absolutely. But the commission, I mean, that's their basic argument, that there was a wrong and there has to be a forum in which to seek redress. And before you answer, let me follow up to Justice Cunningham's question. The problem with your side of the case, if we say they must have a remedy, is the legislature, after the fact, then told the ICC, well, even though basically change the rules in the middle of the game, and then everything the ICC did was just fine, or everything ComEd did was just fine, and therefore the ICC no longer has authority to do anything about the failure of ComEd to obey the schedule in the first instance, which is all public Act 9815. So doesn't that leave them without a forum? Well, it leaves them without a forum, perhaps, to complain about any violation of that scheduling order. But this is not a case about whether a particular schedule was met or not. It's a case about whether and to what extent rates are going to reflect benefits of smart meters. The schedule is a pure red herring in this case. The real question is how much are people going to pay for electric service into the future? And the IMA sets forth timetables and requirements that ComEd must meet with respect to the deployment of smart meters in terms of performance. The $182 million that the appellants talk about, that consists of a number of elements of reducing consumption on inactive meters, for example, reducing estimated electric bills, and there are a number of others. And collectively, those were expected to produce about $182 million in benefits under the original schedule. But it's important to know that IMA says, ComEd, if you don't meet certain goals with respect to consumption on inactive meters and estimated bills, some of these other things, then in rate proceedings, the commission will reduce your allowed return on equity by a certain amount. That's a recourse that's available to any customer, assuming in the event that those benefits of smart meters are not achieved by ComEd. IMA also sets forth a remedy in the event that a company does not meet a deployment schedule of smart meters. If the company is materially deficient in implementing its deployment schedule, there is a remedy, and that remedy is, for better or worse, a corrective action plan. But the General Assembly has contemplated that. They have addressed that issue. They have said, Here is what the remedy will be in the event a company doesn't meet a deployment schedule. So I think the schedule is really not the issue in this case. The real issue in this case is what are the rates going to be under whatever schedule is adopted versus under the June 2012 schedule. But the schedule is related to it because if they decided, for example, they're just not going to follow the schedule that the IAC set and they won't do it for another 20 years, how can you say it's not related? It is related. No, I'm saying the lost benefits are not related to the schedule by itself. For example, when I was telling you about the reduction on return on equity in the event the metrics are not met, that can happen even if the schedule had been met. If that original June 2012 schedule had been met, but these performance objectives had not been achieved, ComEd faced the consequences of a rate reduction. So that's why I say the schedule is really not what produces the benefits by itself. It's the performance of these meters. And this is not directly relevant, but we keep hearing about this $182 million, and in their brief they have said now the situation is even worse, that even though we now have an accelerated schedule, the lost benefits are going to be even more. That is not correct. That's a gross misinterpretation of the most recent evidence before the commission. In fact, most recent evidence before the commission shows that under the current schedule placed in effect in the summer of 2014, the benefits to customers 20 years into the future are going to be even greater than the benefits that would have been achieved under that original schedule. That's because all of the meter installation has been accelerated. The last meter will now be installed in 2018 instead of 2021, so the benefits are accelerated. Again, it's more of a rhetorical point, frankly, than one that goes to the question of the jurisdiction of the commission versus the court. But it is a substantive point in that what it shows is, and this is really point number three, why Pusateri is so important, and Justice DeLore, you pointed that out yourself. In Pusateri, the plaintiffs there said, well, we can bring expert witnesses in before the courts and we can have the experts make predictions about what rates would have been had not these allegedly false reports been filed with the Commerce Commission. And the Pusateri court said, well, no, we cannot do that. That is an invasion of the statutory responsibility of the Commerce Commission. Mr. Stahl, before your time runs out, let me ask you, let's talk about the constitutional issue here involving Public Act 9815, which is basically the legislature reversing an administrative agency's decision or basically saying, I mean, we all know what it says. It shall be deemed to be in full compliance and giving an imperature of whatever comment it did. Is there a claim in this case that is somehow before us relating to the constitutionality of that switcheroo, so to speak? I know you argue that they don't have standing, but let's not talk about that. Well, the claim has been made. They claim that Section 16108.5L is unconstitutional in its entirety. Is there a claim in the underlying complaint for a declaratory judgment of some sort? This was argued before the circuit court, but the circuit court did not reach the issue because it decided on the basis of exclusive jurisdiction. But it was briefed below, and I think it's ripe for decision here. And I would just say with respect to that, they have not cited a single case that says that a legislature cannot undo the results of even a final administrative agency decision. They claim primarily it's a separation. Is this issue only for the ICC because utility regulation is considered legislative? Can the legislature pass a law saying, well, we don't like it that the Human Rights Commission ruled in favor of that waitress. So we're going to pass a law saying that Denny's restaurants shall be deemed to have not violated her civil rights. You know, I don't know the answer to that. It's certainly not the issue here. But I will say the United States Supreme Court has answered that question twice and has essentially said, yes, the Congress can undo what an administrative agency has done. The two cases are immigration and naturalization versus Chadha from the Supreme Court. Was that a legislative veto case, though? Well, it's the same thing as this. It's a legislative overruling of final agency action, which there was a hearing. They had all of these so-called quasi-judicial procedures that appellants talk about here. And the court said it's not a problem for Congress to do that. Congress just did it the wrong way. It was one House of Congress, and the bill wasn't presented to the president. There's an important footnote. Take a look at footnote 8 in Chadha, which says presumably Congress could have done this had they done it properly. So that's one case. You know, there's a difference here, though. The Illinois Constitution of 1970 uses somewhere in there it addresses administrative agencies. I think it's in the judiciary article. All right. Well. It says, you know, administrative agencies shall have such powers as provided by laws. Where does that affect? Okay. All right. When the U.S. Constitution was drafted, administrative agencies essentially didn't exist. All right. True. So I'm going back to my Denny's waitress argument. Are you saying the Illinois legislature can just pass a law saying we don't like when the Human Rights Commission did something? If the Human Rights Commission is a creation of the legislation, I would say yes. Even after they've rendered a final and appealable order with a money judgment. Yes. I think so. Because the Human Rights Commission is not a judicial agency. The Illinois Constitution. I agree. It can be abolished. All right. By law. Absolutely. What can the legislature on a case-by-case basis say? Unless they're interfering with the judicial branch, and the judicial branch is defined by the Constitution. It's not an ex post facto action? It's not an ex post facto because that's essentially what's known as it could be a bill of attainder, or it's criminalizing something that was not criminal at the time the act was committed. I think that's a concern about ex post facto. I think we've gone astray. I don't believe this decision will be rendering a constitutional reversal. It's not necessary. I think clearly not necessary. The other case is Paramino, though, Justice DeLorte, and it's quite clear. The Supreme Court said there all of these cases that appellants are talking about here are not relevant because they all involve legislative changes to administrative activity, and those are different cases. All right, Mr. Stahl, let me ask you to conclude. Well, I didn't get to my final points on Pusateri, but I think you've obviously read the opinion closely. I really have nothing further to say. I think it should be affirmed on grounds of exclusive jurisdiction. Thank you. Mr. Shannon, you've got about four or five minutes. Your Honor, both you and Justice Cunningham raised a very, very important issue near the beginning of Mr. Stahl's presentation. If, Your Honors, you do not reverse this case, there is no forum to which my clients can go to make a complaint about delay in smart meter deployment. PLA. Pardon me? Petition for leave to appeal. You're not foreclosed. No, no, Judge. What I meant to say was that you are correct. If we lose, there is some place we could go. My point is that if the court were to rule, and or the Supreme Court were to rule, that exclusive jurisdiction principles trump the statutory language of Section 5201, and we may not bring a claim in the circuit court, we may also not bring a claim in the ICC. And you called Mr. Stahl out on it. One of his first words were, if she's one of the people who was in the area that didn't get their smart meters in 2012, she can go to the ICC. And then you asked him, but wait a second, the Illinois legislature took away from the ICC, and I want to read that word precisely because it's very important. It shall be deemed to have complied. That, and they go further than that, Your Honor. The commission shall not undertake any investigation of a utility's compliance and compliance with any order issued in that period, and no penalty shall be assessed or adverse action taken against a participating utility for noncompliance with commission orders associated with sections, and then they list some sections. And is there any other company other than ComEd that would be the subject of their sentence? No. They were the only ones who violated a direct commission order during that period. So this was a legislative attempt to say that whatever they did wrong in that period, you cannot go back to the commission and make an argument that they violated your order. And so we're left, and my colleague made another point while we were sitting there. Mr. Stahl talked about this corrective action plan, all the different things that IEMA would allow the commission to do to come in and try to correct the situation after the fact. But IEMA did not repeal Section 5201. It could have. It could have said that the corrective action plan is the only way to correct a utility's direct violation of a commission order, and it didn't foreclose plaintiffs from still using Section 5201 and going to the circuit court in appropriate circumstances. So if your owners are concerned, and you should be, and it sounds like you are, that this is a right without a remedy, that there is no place for our clients to go to correct a direct and purposeful, willful breach of a commission order. You can't have class actions in the commission. You don't get punitive damages in the commission. There are a number of reasons why the legislature left that 5201 route open in a situation like this. One other thing about both Pusateri and Scheffler. All these cases, all the exclusive jurisdiction cases, use the phrase, the nature of the relief sought. Now, if you jump to the end of this end game and say it's ultimately about rate making, in some senses everything is ultimately about rate making. But what the cases ask your owners to focus on is the nature of the predicate allegations in the first instance. It's a little bit like, you know, if you're in a car crash with a Commonwealth Edison truck, it's very obvious on this extreme. And if you have a tariff regarding how ComEd is supposed to behave during a storm and what sort of services provide, it's very clear on this extreme. We think we're pretty close, somewhere in the middle, but the issue is not just a default to the words rate making. And I would ask your owners to look. Mr. Stahl spent a lot of time on how the cost benefit of the delay may or may not have hurt consumers. And in the second paragraph of the EIMA amendment, the legislature defined cost beneficial for purposes of the statute. And it's 16-108.6A, the definition of cost beneficial. And under that definition, there are damages that occur to our clients that they should be able to see in the circuit court. All right. Thank you, Your Honor. We would ask for all these reasons and the reasons stated in our briefs for your honors to reverse the circuit court and send the case back to the circuit court for further proceedings. All right. Thank you, counsel, for your arguments. The court will take the matter under advisement and court stands in recess.